# **<u>EXHIBIT A</u>**



*Filed and Attested by the
Office of Judicial Records
24 NOV 2025 11:41 am
S. GILLIAM*



**BY:    Evan M. Padilla, Esquire**
**Attorney I.D. No. 313596**
**Evan@TeamLawyers.com**
**32 Parking Plaza, Suite 401**
**Ardmore, PA 19003**
**(215) 575.7615; (215) 575.7605 (Fax)**                    **Attorney for Plaintiff**

|  |  |
|---|---|
| CLAUDIA POST<br>1045 Frankford Ave., Apt. 302<br>Philadelphia, PA 19125<br>    Plaintiff, | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: CIVIL ACTION<br>:<br>: **MAJOR JURY**<br>: |
| v. | : OCTOBER TERM, 2025<br>: |
| JONATHAN MONK<br>902 Liverpool Lane<br>Avondale, PA 19311 | : CASE NO.: 251001108<br>:<br>: **JURY TRIAL DEMANDED**<br>: |
| and | :<br>: |
| ANDREW FAULKNER<br>2224 Taggert St.<br>Philadelphia, PA 19125 | :<br>:<br>:<br>: |
| and | :<br>: |
| AFJM HOLDINGS, LLC<br>115 Carpenter Ln, Apt. 3<br>Philadelphia PA 19119 | :<br>:<br>:<br>:<br>: |

**NOTICE/AVISO**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court with only such further notice to you as may be required by law, for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la demanda y la notificación, hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a la demanda en contra de su persona. Sea avisado que si usted no se defiendo la corta tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corta puede decidir a favor del demandante y requiere que usted cumpla con indas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE, OR IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>1101 MARKET STREET<br>PHILADELPHIA, PA 19107<br>TEL: (215) 238-1701 | LLEVE ESTA DEMANDA A UN ABOCADO IMMEDIATAMENTE SI NO TIENE ABOCADO O SI NO TIENE EL DINFRO SUFICIENTE DE PACSR TEL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERICUAR DONDE SE PUEDE CONSECUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE<br>FILADELFIA, SERVICIO DE REFERENICA<br>ONE READING CENTER<br>1101 MARKET STREET<br>FILADELFIA, PA 19107<br>E INFORMACION LEGAL   TEL: (215) 238-1701 |
| --- | --- |

## PARTIES

1.      Claudia Post is an adult citizen and resident of the Commonwealth of Pennsylvania residing at the above captioned address.

2.      Jonathan Monk is an adult citizen and resident of the Commonwealth of Pennsylvania residing at the above captioned address.

3.      AFJM Holdings is a corporation formed under the laws of the Commonwealth of Pennsylvania with a registered agent at the above captioned address.

4.      Andrew Faulkner is an adult citizen and resident of the Commonwealth of Pennsylvania and resides at the above captioned address.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the instant action because all parties are either residents of the Commonwealth, corporations organized under the laws of the Commonwealth, or individuals whose ownership interest in a corporation are as such that they avail themselves to the jurisdiction of this Court.

6.      Venue is proper in Philadelphia County as all parties either reside in Philadelphia, are businesses with principal places of business in Philadelphia, or are individuals whose ownership interest in a corporation are as such that they avail themselves to the jurisdiction of this Court.

Case ID: 251001108

## FACTS

### Background – Jonathan Monk

7.     For many years prior to the entanglement that is described in this Complaint, Claudia Post had operated several successful companies in the cannabis consulting space.

8.     Ms. Post initially hired Mr. Monk as an intern.

9.     On or about October 29, 2018, after working with Mr. Monk for several years, she desired to bring him on as a partner in her newly formed company, Buttons and Bows, Inc. d/b/a a/k/a Smokin' Hot Solutions ("Smokin' Hot"), that operated as MOST Consulting[1]; consulting, advertising, and regulatory compliance for cannabis companies.

10.     Ms. Post and Mr. Monk entered into a partnership agreement, a copy of which is attached hereto as Exhibit "A".

11.     Ms. Post was a 60% partner and Mr. Monk was a 40% partner.

12.     Some time after the partnership was formed, the partners hired Andrew Faulkner.

13.     Smokin' Hot began to grow and produce significant revenue, which was both shared between the partners and used to expand the business.

14.     In or around February of 2020, however, Mr. Monk began to take advantage of his status as a partner and open an American Express Business (the "Amex") credit card in his name on behalf of Smokin' Hot.

15.     Almost immediately, Mr. Monk began charging nearly all of his personal expenses on the Amex on an almost daily basis.

16.     These purchases had no legitimate business purpose and were purely personal expenses that Mr. Monk did not wish to pay for with his own money.

---

[1] MOST is a combination of MOnk and POst.

17.     These expenses ranged from the mundane, such as dinner, groceries, and Amazon purchases, to the extravagant, including:

a.   Thousands of dollars of international flights;

b.   Personal moving expenses and furniture;

c.   Countless hotel stays and rental cars;

d.   Tickets to professional soccer and baseball games;

e.   Over $30,000 in meals, including extravagant dinners at local restaurants such as Talula's Garden, Abe Fisher, Parc, and La Calaca Feliz, none of which had any legitimate business purpose.

18.     Mr. Monk used funds generated by Smokin' Hot's business to pay the monthly bill on the Amex for over ninety thousand ($90,000) of personal expenses.[2]

19.     Mr. Monk paid for all of these expenses out of the MOST capital account, deducting funds needed to pay employees, pay rent, and otherwise run the business to fund an extravagant lifestyle that he could not himself sustain.

20.     While the agreement required Mr. Monk to reimburse these funds to MOST, he has never made any attempt to do so and routinely pays for all of his personal expenses on the MOST credit card, using MOST funds.

21.     Mr. Monk, on information and belief, never declared this additional income as taxable nor did he ever inform anyone at Smokin' Hot, including but not limited to Ms. Post, that he was using company funds on a daily basis to fly around the world and order delivery meals for himself and his girlfriend.

22.     These funds were never reimbursed to Smokin' Hot.

---

[2] In comparison, Ms. Post's charges to the same American Express card over that time frame amounted to slightly over $5,000.

23.     During this time, Mr. Monk relocated to London where he stopped all work for MOST and began pursuing other ventures.

24.     During this time, he solicited business personally from clients of MOST and new clients to perform work that MOST performs, namely license applications for dispensaries.

25.     Specifically, Mr. Monk partnered with Vipul Patel, a client of MOST for some time, to apply for cannabis licenses in Kentucky where Mr. Patel and business partners purchased properties.

26.     Mr. Monk partnered with Mr. Patel in a business known as Acorn Dispensary, LLC ("Acorn") in a 50/50 partnership.

27.     Mr. Patel and associates purchased four properties in Kentucky for the purposes of applying for cannabis licenses.

28.     These license applications require, amongst other things, documentation of a lease for the proposed location of the dispensary.

29.     Mr. Monk, by and through Acorn Dispensary, LLC, would apply for cannabis licenses through Acorn by signing lease agreements for properties owned by entities controlled by Mr. Patel in order to obtain a license under Kentucky law.

30.     Mr. Monk obtained substantial income from these activities in Kentucky.

31.     These activities fell under the purview of the business of MOST, yet Mr. Monk kept these business dealings a secret so as to not share any of the proceeds with Ms. Post as required under their partnership agreement.

32.     None of this work was disclosed to MOST, no written authorization exists from any partner of MOST, and none of the substantial income he derived from this work was ever shared in accordance with the partnership agreement.

33.     As of June 26, 2025, Mr. Monk has ceased any and all association with MOST, telling clients of AFJM/MOST that he had "sold the company" and no longer works there, in attempt to furth siphon business from MOST by insinuating to new potential customers that he was now out on his own.

### Background – Andrew Faulkner

34.     Mr. Faulkner began working at Smokin' Hot in or around 2019.

35.     He and Mr. Monk became fast friends, and soon thereafter Mr. Faulkner was granted access to the Amex by Mr. Monk.

36.     Mr. Faulkner charged over eight thousand ($8,000) dollars of personal expenses including Uber trips and daily trips to coffee shops over a period of approximately two years.

37.     These charges had no legitimate business purpose and were never reimbursed to MOST.

38.     Similar to Mr. Monk, and under the direction and knowledge of Mr. Monk, Andrew Faulkner partnered with a business client of MOST for the purpose of obtaining cannabis licenses and selling them for a profit.

39.     Mr. Faulkner partnered with Vishal Patel in Honeysuckle Dispensary, LLC ("Honeysuckle") as a 50/50 partner.

40.     Honeysuckle would then sign leases with properties controlled by Mr. Patel in order to obtain dispensary licenses, which would then be sold at a profit.

41.     These activities were under the purview of the business of MOST, which Mr. Faulkner was well aware of, and he instead created a clandestine business in order to avoid any knowledge on behalf of MOST.

## Background – AFJM Holdings

42.     In or around April of 2022, Mr. Faulkner and Mr. Monk formed a corporation known as AFJM Holdings, LLC.

43.     On information and belief, Mr. Faulkner and Mr. Monk became frustrated that Plaintiff Claudia Post declined Mr. Faulkner's request to become an equity partner in MOST and conspired to create a competing business which could siphon funds to both Mr. Faulkner and Mr. Monk without having to share them with MOST.

44.     The corporation continues to have a registered address at Mr. Faulker's previous residence in the Germantown section of Philadelphia.

45.     In or around that same time, Mr. Faulkner and Mr. Monk used AFJM to siphon funds from MOST to AFJM in order to enrich themselves in a scheme or artifice to defraud MOST of fees that it was contractually obligated to receive.

46.     After AFJM was created, when MOST would receive an inquiry regarding new business, Mr. Monk and/or Mr. Faulkner would direct those new customers to pay the "setup fee" to AFJM.

47.     The AFJM invoices would be sent via Mr. Faulkner or Mr. Monk's MOST email account, directing the clients to pay AFJM directly into an account controlled by AFJM.

48.     He and/or Mr. Faulkner would then direct each new customer to continue to pay monthly invoices to AFJM directly, despite those customers believing they were customers of MOST and having sought out MOST for its expertise in the cannabis field.

49.    All of invoices from AFJM to its clients were sent using Mr. Monk and/or Mr. Faulkner's MOST email accounts under the guise of a collaboration with MOST.

50.    Monk and/or Faulkner continued this practice with AFJM for several years, netting tens of thousands of dollars in funds that were the property of MOST for themselves.

51.    All of this was conducted through Mr. Monk's MOST email account, with clients being led to believe these transactions were related to their contractual relationship with MOST.

52.    When questioned by clients of MOST regarding the new AFJM entity, Mr. Monk would explain that he "sold MOST" and was operating out of a new entity despite continuing to use his MOST email address.

53.    In the aforesaid correspondence, Mr. Monk indicated that since he was no longer associated with MOST, the MOST client could be free to deal "directly with" Mr. Monk.

54.    This is in stark contrast to Mr. Monk's repeated requests to be bought of his share of MOST after sending this correspondence, as only one of the two can be true.

55.    He currently holds himself out as the CEO of JOIA International, Inc., as well as the founder and general partner of Walnut Street Holdings if his LinkedIn profile is to be believed.

56.    AFJM was and is a directly competing business with MOST, and Mr. Monk derived substantial income from AFJM which is the rightful property of MOST under the Agreement.

57.    No written consent from Ms. Post exists, as required under the Partnership Agreement, permitting Mr. Monk to engage in the AFJM business.

## **COUNT I – BREACH OF CONTRACT**

### **Claudia Post v. Jonathan Monk and AFJM Holdings, LLC**

58.    Plaintiff incorporates by reference the averments contained in the above paragraphs as if the same were set forth more fully at length herein.

59.    At all times material hereto, Ms. Post and Mr. Monk were parties to the Agreement, and intended to be bound by the terms and conditions of the same.

60.    At all times material hereto, AFJM acted as an alter ego for Mr. Monk, who along with Mr. Faulkner were the sole partners of AFJM, conducted business through AFJM, and used AFJM merely as a corporate veil to his activities and provide a sense of legitimacy to clients.

61.    Clause XXXIII of the Agreement – Duty of Loyalty, sets forth as follows:

No Partner will engage in any business, venture, or transaction, whether directly or indirectly, that might be competitive with the business of the Partnership or that would be in direct conflict of interest to the Partnership without the unanimous written consent of the remaining Partners. Any and all business, ventures, or transactions with any appearance of conflict of interest must be fully disclosed to all other Partners. Failure to comply with any of the terms of this clause will be deemed an Involuntary Withdrawal of the offending Partner and may be treated accordingly by the remaining Partners.

62.    Mr. Monk breached Clause XXXIII of the Agreement by forming AFJM Holdings, LLC and Walnut Street Investments, LLC and directly competing with MOST, thereby enriching himself and depriving MOST of profits that it was entitled to under the Agreement.

63.    Mr. Monk derived profit from AFJM and Walnut Street through the name of MOST and the business connections of MOST.

64.    No written consent was ever given by Ms. Post to engage in any of these ventures, as she was completely unaware of them until recently.

65.    Mr. Monk therefore breached Clause XXXIII of the Agreement and is liable for the consequential and all other damages related to the same and must reimburse the partnership for all private profits derived from AFJM and Walnut Street in accordance with the Agreement.

66.    Clause XXXIV of the Agreement – Duty of Accountability for Private Profits sets forth as follows:

> Each Partner must account to the Partnership for any benefit derived by that Partner without the consent of the other Partners from any transaction concerning the Partnership or any use by that Partner of the Partnership property, name, or business connection. This duty continues to apply to any transactions undertaken after the Partnership has been dissolved but before the affairs of the Partnership have been completely wound up by the surviving Partner or Partners or their Agent or Agents.

67.    Jonathan Monk derived financial benefit from AFJM as well as his activities in Kentucky with Acorn, and his benefit from both was derived from the knowledge, name, and business connections of MOST.

68.    Jonathan Monk never accounted to the partnership the benefits he derived from the aforesaid business activities, of which Ms. Post entitled to 60% of the same.

69.    Ms. Post never provided written consent for him to enter into any of the aforesaid competing and/or related business ventures, of which there may be more that have yet to be discovered.

70.    Mr. Monk conducted all of the aforesaid business ventures from his MOST email account..

71.    Mr. Monk conducted this competing business while collecting a salary from MOST and failing to disclose his activities as required under the partnership agreement.

72.    The partnership remains valid and has not been dissolved.

73.    Mr. Monk therefore breached Clause XXXIV of the Agreement and liable for the consequential damages of the same.

74.    Ms. Post, as 60% partner of MOST, has been damaged due to Mr. Monk's breach of the Agreement by his failure to account for and reimburse the partnership for profits that he derived in contravention of the partnership agreement he signed and intended to be bound by.

75.    Under the Agreement breach of Articles XXXIII and XXXIV results in involuntary dissolution and expulsion from the partnership.

76.    Involuntary dissolution and expulsion require a full accounting of each partner's capital account and a valuation of each partner's interest pursuant to Article XXIX.

77.    On information and belief, Mr. Monk owes substantial amounts to MOST on account of his breach of the aforementioned clauses by setting up clandestine, competing businesses with no written consent and earning substantial income from the same.

78.    He must also reimburse MOST for the profligate personal spending on the MOST American Express account totaling over $90,000.

79.    Ms. Post therefore requests a full and complete accounting of Mr. Monk's partnership interest in MOST, including all profits derived in contravention of the Agreement.

WHEREFORE Claudia Post demands judgment in her favor and against Defendant, Jonathan Monk, together with:

1.    A full and complete accounting of Mr. Monk's partnership interest in MOST in accordance with Article XXXIV;

2.    Reimbursement of all profits and income due to the partnership derived by Mr. Monk and not paid to the partnership under Article XXXIII and Article XXXIV from the competing business formed by Mr. Monk including but not limited to AFJM Holdings, JOIA International, Walnut Street, and any other competing business formed and/or entered into by Mr. Monk without prior written consent;

3.    Dissolution of Buttons and Bows, Inc. d/b/a a/k/a Smokin' Hot Solutions;

4.    Attorneys fees and costs; and,

5.    Any other relief which this Court deems reasonable under the circumstances.

## COUNT II – FRAUD AND UNJUST ENRICHMENT

### Claudia Post v. Jonathan Monk, Andrew Faulkner, AFJM Holdings, LLC

80.     Plaintiff incorporates by reference the averments in the above paragraph as if set forth more fully at length herein.

### Fraud Involving the American Express Card

81.     At all times material hereto, Plaintiff and Mr. Monk were in a partnership and owed each other a duty of loyalty.

82.     At all times material hereto, Mr. Monk held a contractual duty as a partner in MOST to avoid waste, properly disclose all expenses, and to reimburse the partnership for all expenses not directly related to the business.

83.     Andrew Faulkner, as an employee of MOST, owed a duty of loyalty to the company.

84.     Mr. Monk applied for and was granted use of the corporate American Express card, which he represented to Plaintiff was to be used for legitimate business expenses.

85.     Mr. Monk materially misrepresented his use of the card to Plaintiff and charged over $90,000 of personal expenses to the card that had no legitimate business purpose.

86.     Mr. Monk failed to reimburse the company for any of these expenses, instead withdrawing funds from the MOST operating account to pay for his personal expenses on his American Express card.

87.     These charges were never approved by Plaintiff, nor were they ever disclosed to Plaintiff until she began reviewing the credit card statement.

88.     Similarly to Mr. Monk, as immediately after Mr. Faulkner was made an authorized user of the American Express card, he charged over $8,000 of personal expenses on the card and failed to reimburse MOST.

89.    Mr. Monk paid for these expenses of Mr. Faulkner through the MOST operating account.

90.    The aforesaid acts constitute fraud as both Mr. Monk and Mr. Faulkner made material representations to Plaintiff that the credit cards would be used for legitimate business expenses and instead used the cards for personal expenses.

91.    Mr. Monk and Mr. Faulkner further defrauded Plaintiff by representing that these charges were legitimate business expenses when, almost entirely, these expenses were for purely personal expenses that Mr. Monk and Mr. Faulkner did not feeling like paying for themselves and preferred to defraud the company.

92.    Mr. Monk and Mr. Faulkner further defrauded MOST by using the MOST operating account to pay for these credit card charges and failing to reimburse MOST for the same.

93.    Plaintiff relied upon the representations of Mr. Monk and Mr. Faulkner that they would not use the cards for personal expenses.

94.    Plaintiff further relied upon the representations of Mr. Monk and Mr. Faulkner that they would reimburse MOST for expenses charged to the cards that were personal in nature.

95.    As a result of the material misrepresentations of Mr. Monk and Mr. Faulkner which constitute common law fraud, Plaintiff suffered monetary harm.

96.    The aforesaid fraudulent acts of Mr. Monk and Mr. Faulkner constitute unjust enrichment, as they siphoned most from MOST's operating account to pay for their own personal expenses.

97.    Neither Mr. Monk nor Mr. Faulkner were entitled the MOST funds which were used to pay for personal expenses.

**Fraud Involving AFJM Holdings**

98.    Mr. Monk and Mr. Faulkner formed AFJM Holdings for the purposes of siphoning money, clients, and fees that were the legitimate property of MOST into their own pockets.

99.    At all times material hereto, AFJM acted as an alter ego for Mr. Monk and Mr. Faulkner, who were the sole partners of AFJM, conducted business through AFJM, and used AFJM merely as a corporate veil to shield their activities and provide a sense of legitimacy to clients.

100.    As set forth above and incorporated by reference herein, Mr. Monk and Mr. Faulkner created AFJM as a competing business to MOST and immediately upon its formation began invoicing MOST clients for work performed by MOST employees and partners to pay AFJM.

101.    Ms. Post relied upon the representations by Mr. Monk and Mr. Faulkner that they were performing work only on behalf of MOST, and that the contractual relationships fostered and originated by MOST were resulting in fees being paid directly to MOST.

102.    Mr. Monk and Mr. Faulkner used these material misrepresentations to enrich themselves and AFJM Holdings at the expense of MOST, which was the lawful recipient of the funds siphoned away by AFJM.

103.    As a result of the material misrepresentations of Mr. Monk and Mr. Faulkner which constitute common law fraud, Plaintiff suffered monetary harm.

104.    The aforesaid fraudulent acts of Mr. Monk and Mr. Faulkner constitute unjust enrichment, as they siphoned money from MOST's existing contractual relationships that was property of MOST into their own personal bank accounts and/or bank accounts they controlled.

105.    No prior written consent was ever given related to the formation of AFJM and its operation by Mr. Monk or Mr. Faulkner.

106.    On information and belief, funds from the business activities of Acorn and Honeysuckle were funneled through AFJM in order to pay Mr. Monk and Mr. Faulkner.

**Fraud and Embezzlement Involving Acorn Dispensary, LLC**

107.    On October 8, 2024, Jonathan Monk formed Acorn with Vipul Patel.  (Exhibit "B" – Operating Agreement for Acorn).

108.    Mr. Patel, along with his brother, were long time clients of MOST and had amassed properties in several states, including Kentucky, to be used for the purpose of applying for cannabis licenses.

109.    The Patels, along with Mr. Monk, devised a scheme wherein they would use Mr. Monk and Mr. Faulkner to create corporations to apply for cannabis licenses, and then sign leases to operate dispensaries on land owned and/or controlled the Patels.

110.    These licenses would then be sold for a profit to be returned to the Patels, Mr. Monk, and Mr. Faulkner.

111.    The purpose of Acorn, as set forth above and incorporated at length herein, was to apply for and sell dispensary licenses in the Commonwealth of Kentucky.

112.    MOST, for several years, had provided services to clients in the complex and arcane field of compliance in these applications.

113.    Not wanting to share in the profits of the sale of these applications, or in the consulting fees generated from preparing them, Mr. Monk set up a series of corporations in order to funnel these proceeds directly to himself and cutting out MOST, in violation of the partnership agreement.

114.    Acorn applied for four (4) licenses in Kentucky, after which the company was sold for substantial profit as it was granted dispensary licenses.

115.    None of these profits were shared with MOST, nor were they ever disclosed.

116.    There is no writing from any partner in MOST permitting Mr. Monk to engage in these activities, as they were kept completely hidden from his partner until recently.

117.    No permission was ever solicited from his partner, nor was any disclosure ever made regarding the same.

118.    It is entirely possible there are more of these entities in other states, which was part of Mr. Monk's scheme to increase his own personal bottom line while cutting out MOST in violation of the partnership agreement.

### **Fraud and Embezzlement Involving Honeysuckle Dispensary, LLC**

119.    Similar to Mr. Monk's scheme with Acorn, Mr. Faulkner set up corporation identical to Acorn, known as Honeysuckle Dispensary, LLC.  (Exhibit "C").

120.    Mr. Faulkner partnered with Vishal Patel in Honeysuckle, operating an identical scheme to apply for licenses using leases for properties owned and/or controlled by the Patels.[3]

121.    Once these licenses were granted, the company would then be transferred for substantial gains to an operator.

122.    Mr. Faulkner engaged in these activities through his MOST email account, on MOST company time, and at the direction and/or supervision of Mr. Monk.

123.    On information and belief, the funds generated by Honeysuckle were run through AFJM in order to avoid having to share the same with MOST.

### **Fraud Involving Maryland License Applications**

---

[3] The parties applied for four (4) licenses each, both at the same four (4) properties with signed leases for buildings that did not exist.  Mr. Monk and Mr. Faulkner prepared identical applications, all with the same signed leases for the same nonexistent buildings, simply under different LLCs.

124.    Similar to the above scheme, but on their own, Mr. Monk and Mr. Faulkner applied for and were granted a Maryland dispensary license.

125.    This license was then sold to a third party for a substantial gain.

126.    None of this was disclosed to MOST, no permission was sought, nor were any profits shared, all of which violated the partnership agreement.

127.    The corporation or corporations used to perpetrate this scheme are not yet known to Plaintiff, as she was completely unaware of this until recently.

WHEREFORE Claudia Post demands judgment in her favor and against Defendants, Jonathan Monk and Andrew Faulkner, jointly and severally, together with:

1.    A full and complete accounting of Mr. Monk's partnership interest in MOST in accordance with Article XXXIV;

2.    Reimbursement of all profits and income due to the partnership derived by Mr. Monk and not paid to the partnership under Article XXXIII and Article XXXIV from the competing business formed by Mr. Monk including but not limited to AFJM Holdings, Acorn Dispensary, LLC, Honeysuckle Dispensary, LLC, and any other competing business formed and/or entered into by Mr. Monk without prior written consent;

3.    Reimbursement of all funds taken from the MOST operating account to pay for personal expenses by Mr. Monk;

4.    Reimbursement of all funds taken from the MOST operating account to pay for personal expenses by Mr. Faulkner;

5.    Reimbursement of all funds derived by Mr. Faulkner from AFJM and Honeysuckle;

6.    Reimbursement of all funds derived by Mr. Monk from AFJM and Acorn;

7.    Dissolution of Buttons and Bows, Inc. d/b/a a/k/a Smokin' Hot Solutions;

8.     Attorneys fees and costs; and,

9.     Any other relief which this Court deems reasonable under the circumstances.

## COUNT III – CIVIL RICO

### Claudia Post v. Jonathan Monk, Andrew Faulkner, and AFJM Holdings

128.    Plaintiff incorporates by reference the averments contained in the preceding paragraphs as if the same were set forth more fully at length herein.

129.    Mr. Monk and Mr. Faulkner, by and through AFJM Holdings, engaged in a scheme or artifice to defraud MOST of the proceeds of its contracts and business relationships by surreptitiously creating a corporation to funnel proceeds of contracts signed with existing MOST clients.

130.    Mr. Monk, through Acorn, and Mr. Faulkner, through Honeysuckle, created clandestine corporations by which they would collect compensation for their work in applying for cannabis licenses directly, and not having to share the funds with MOST.

131.    At all times material hereto, AFJM acted as an alter ego for Mr. Monk and Mr. Faulkner, who were the sole partners of AFJM, conducted business through AFJM, and used AFJM merely as a corporate veil to shield their activities and provide a sense of legitimacy to clients.

132.    The predicate acts of fraud, which have been set forth above and incorporated by reference herein, included but are not limited to:

   a.   Issuing AFJM invoices to MOST clients for work being done by MOST employees through MOST email accounts yet keeping all of the proceeds;

   b.   Routinely and systematically charging thousands of dollars of personal expenses to a MOST issued credit card and then directing MOST funds be used to pay the card balances;

c.   Creating corporations for the purposes of competing with MOST and/or siphoning business from MOST while working for and being paid by MOST;

133.   The purpose of this enterprise was to fraudulently siphon funds due to MOST under existing contracts away from MOST and into their own pocket.

134.   The predicate acts include but are not limited to clandestinely forming corporations to siphon funds for their own personal use in breach of the MOST partnership agreement.

135.   Plaintiff has suffered economic and consequential harm as a result of this fraud, the extent of which is not yet known.

WHEREFORE Claudia Post demands judgment in her favor and against Defendants, Jonathan Monk and Andrew Faulkner, jointly and severally, together with:

1.   A full and complete accounting of Mr. Monk's partnership interest in MOST in accordance with Article XXXIV;

2.   Reimbursement of all profits and income due to the partnership derived by Mr. Monk and not paid to the partnership under Article XXXIII and Article XXXIV from the competing business formed by Mr. Monk including but not limited to AFJM Holdings, JOIA International, Walnut Street, and any other competing business formed and/or entered into by Mr. Monk without prior written consent;

3.   Reimbursement of all funds taken from the MOST operating account to pay for personal expenses by Mr. Monk;

4.   Reimbursement of all funds taken from the MOST operating account to pay for personal expenses by Mr. Faulkner;

5.   Reimbursement of all funds derived by Mr. Faulkner from AFJM;

6.   Dissolution of Buttons and Bows, Inc. d/b/a a/k/a Smokin' Hot Solutions;

7.    Treble damages;

8.    Attorneys fees and costs; and,

9.    Any other relief which this Court deems reasonable under the circumstances.


                                **ZAJAC & PADILLA, LLC**


Dated: November 24, 2025        BY: _____
                                    Evan M. Padilla, Esq.
                                    *Attorney for Plaintiff*

## **VERIFICATION**

I, Claudia Post, am the Plaintiff in the instant action and hereby state that the facts above

set forth are true and correct to the best of my knowledge, information, and belief.  The language

is of my attorney and not of my own and was crafted by my attorney based upon my understanding

of the facts and circumstances of the dispute. I understand that the statements herein are made

subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Date: _____11/21/2025_____

DocuSigned by:

_Claudia Post_
2214609B99BF4CE...

Claudia Post

# PARTNERSHIP AGREEMENT

State of Pennsylvania



This Partnership Agreement (the "Agreement") is made and entered into on October 29th, 2018 (the "Execution Date") by and between the following Parties:

Jonathan Monk, located at the following address:

647 N. 15th St. Fl. 3 Philadelphia, PA 19130

and

Claudia Post, located at the following address:

1833 Fairmount Ave. Suite 215 Philadelphia, PA 19130

## BACKGROUND:

A. The Partners wish to associate themselves as partners in business.

B. This Agreement sets out the terms and conditions that govern the Partners within the Partnership.

**IN CONSIDERATION OF** and as a condition of the Partners entering into this Agreement and other valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the Parties to this Agreement agree to the following:

## ARTICLE I. Formation.

1. By this Agreement, the Partners enter into a general partnership (the "Partnership") in accordance with the laws of the State of Pennsylvania. The rights and obligations of the Partners will be stated in the applicable legislation of the State of Pennsylvania (the "Act") except as otherwise provided in this Agreement.

## ARTICLE II. Name.

2. The firm name of the Partnership will be the following: Buttons and Bows Inc. DBA Smokin' Hot Solutions

## ARTICLE III. Purpose.

Case ID: 251001108

3. The purpose of the Partnership will be the following:

    -- To provide marketing and advertising services to clients.

## ARTICLE IV. Term.

4. The Partnership will begin on October 29th, 2018 and will continue until terminated as provided in this Agreement.

## ARTICLE V. Place of Business.

5. The principal office of the business of the Partnership will be located at the following address or other such place as the Partners may from time to time designate:

    1515 N. 5th St. Philadelphia, PA 19122

## ARTICLE VI. Capital Contributions.

6. Each of the Partners has contributed to the capital of the Partnership, in cash, property, or services in agreed upon value, as follows (the "Capital Contribution"):

    a. Jonathan Monk -- $0 (zero US dollar)

    b. Claudia Post -- $0 (zero US dollar)

7. All contributions will be submitted fully and on time, no later than October 29th, 2018.

8. All capital contributions are final unless all partners give written consent of withdrawal.

## ARTICLE VII. Additional Capital.

9. Capital contributions may be amended from time to time, according to the requirements of the Partnership provided that the interests of the Partners are not affected, except with the unanimous consent of the Partners. No Partner will be required to make additional capital contributions. Whenever additional capital is determined to be required and an individual Partner is unwilling or unable to meet the additional contribution requirement within a reasonable period, as required by Partnership business obligations, remaining Partners may contribute in proportion to their existing capital contributions to resolve the amount in default. In such case, the allocation of profits or losses among all the Partners will be adjusted to reflect the aggregate change in capital contributions by the Partners.

10. Any advance of money to the Partnership by any Partner in excess of the amounts provided for in this Agreement or subsequently agreed to as additional capital contribution will be deemed a debt

owed by the Partnership and not an increase in capital contribution of the Partner. This liability will be repaid with interest at rates and times to be determined by a majority of the Partners within the limits of what is required or permitted in the Act. This liability will not entitle the lending Partner to any increased share of the Partnership's profits nor to a greater voting power. Such debts may have preference or priority over any other payments to Partners as may be determined by a majority of the Partners.

## ARTICLE VIII. Capital Accounts.

11. An individual capital account (the "Capital Accounts") will be maintained for each Partner and their initial capital contribution will be credited to this account. Any additional capital contributions made by any Partner will be credited to that Partner's individual capital account.

## ARTICLE IX. Interest on Capital.

12. No borrowing charge or loan interest will be due or payable to any Partner on their agreed capital contribution inclusive of any agreed upon additional capital contributions.

## ARTICLE X. Financial Decisions.

13. Decisions regarding the distribution of profits, allocation of losses, and the requirement for additional capital contributions as well as all other financial matters will be decided by a unanimous vote of the Partners.

## ARTICLE XI. Interest and Authority.

14. The Partners' ownership interest in the Partnership will be as follows:

    a. Jonathan Monk -- 40% (forty percent)

    b. Claudia Post -- 60% (sixty percent)

## ARTICLE XII. Profit and Loss.

15. Subject to the other provisions of this Agreement, the net profits and losses of the Partnership, for both accounting and tax purposes, will accrue to and be borne by the Partners in proportion to the Partners' ownership interest in the Partnership as described above.

16. The profits and losses will be accounted by Joel L. Glauser.

17. The profits and losses will be distributed to the partners using the above Profit and Loss Distribution method once a quarter and will paid on the 1st of of every fourth month.

Case ID: 251001108

18. Each Partner will be responsible for their own taxes on any distribution made.

## ARTICLE XIII. Voting.

19. In any vote required by the Partnership, the vote cast by each Partner will be weighted in proportion to the Partners' ownership interest in the Partnership as described above.

## ARTICLE XIV. Accounting.

20. Accurate and complete books of account of the transactions of the Partnership will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any Partner. The books and records of the Partnership will reflect all the Partnership's transactions and will be appropriate and adequate for the business conducted by the Partnership.

21. Accounting records will be kept on an accrual basis.

## ARTICLE XV. Annual Report.

22. As soon as practicable after the close of each fiscal year, the Partnership will furnish to each Partner an annual report showing a full and complete account of the condition of the Partnership. This report will consist of at least the following documents:

    a. a statement of all information as will be necessary for the preparation of each Partner's income or other tax returns;

    b. a copy of the Partnership's federal income tax returns for that fiscal year;

    c. supporting income statements;

    d. a balance sheet;

    e. a cash flow statement;

    f. a breakdown of the profit and loss attributable to each Partner; and

    g. any additional information that the Partners may require.

## ARTICLE XVI. Banking and Partnership Funds.

23. The funds of the Partnership will be placed in such investments and banking accounts as will be designated by the Partners. All withdrawals from these bank accounts will be made by the duly authorized agent or agents of the Partners as agreed by unanimous vote of the Partners. Partnership funds will be held in the name of the Partnership and will not be commingled with those of any other

person or entity.

## ARTICLE XVII. Fiscal Year.

24. The fiscal year will end on the following date each year: December 31st.

## ARTICLE XVIII. Audit.

25. All accounts related to the Partnership including contribution and distribution accounts will be audited weekly.

26. Any of the Partners will have the right to request an audit of the Partnership books. The cost of the audit will be borne by the Partnership. The audit will be performed by an accounting firm acceptable to all the Partners.

## ARTICLE XIX. Management.

27. Except as the Partners may otherwise agree in writing, all actions and decisions respecting the management, operation, and control of the Partnership and its business will be decided by a unanimous vote of the Partners.

## ARTICLE XX. Contract Binding Authority.

28. All actions and decisions with respect to binding the Partnership in contract requires a unanimous vote of the Partners.

## ARTICLE XXI. Compensation for Services Rendered.

29. Partners may be compensated for services actually rendered as from time to time may be agreed by unanimous vote of the Partners.

## ARTICLE XXII. Tax Matters Partner.

30. The following Partner will serve as the tax matters Partner: Claudia Post. The tax matters Partner will prepare, or cause to be prepared, all tax returns and reports for the Partnership and will make any related elections that the Partners deem advisable.

31. A tax matters Partner can voluntarily withdraw from the position of tax matters Partner or can be appointed or replaced by a majority vote of the other Partners. In the event of a withdrawal of the tax matters Partner from the Partnership, the remaining Partners will appoint a successor as soon as practicable.

**ARTICLE XXIII. Meetings.**

32. Regular meetings of the Partners will be held weekly.

33. Any Partner can call a special meeting to resolve issues that require a vote, as indicated by this Agreement, by providing all Partners with reasonable notice. In the case of a special vote, the meeting will be restricted to the specific purpose for which the meeting was held.

34. All meetings will be held at a time and in a location that is reasonable, convenient, and practical considering the situation of all Partners.

**ARTICLE XXIV. Admitting a New Partner.**

35. A new Partner may be admitted to the Partnership with a unanimous vote of the existing Partners.

36. Any new Partner agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Partner will execute such documents as are needed to effect the admission of the new Partner. Any new Partner will receive such business interest in the Partnership as determined by a unanimous decision of the other Partners.

**ARTICLE XXV. Voluntary Withdrawal of a Partner.**

37. Any Partner will have the right to voluntarily withdraw from the Partnership at any time. Written notice of intention to withdraw must be served upon the remaining Partners at least 3 months prior to the withdrawal date.

38. The voluntary withdrawal of a Partner will result in the dissolution of the Partnership.

39. a Dissociated Partner will only exercise the right to withdraw in good faith and will act to minimize any present or future harm done to the remaining Partners as a result of the withdrawal.

**ARTICLE XXVI. Involuntary Withdrawal of a Partner.**

40. Events resulting in the involuntary withdrawal of a Partner from the Partnership will include but not be limited to: death of a Partner; Partner mental incapacity; Partner disability preventing reasonable participation in the Partnership; Partner incompetence; breach of fiduciary duties by a Partner; criminal conviction of a Partner; Expulsion of a Partner; Operation of Law against a Partner; or any act or omission of a Partner that can reasonably be expected to bring the business or societal reputation of the Partnership into disrepute.

41. The involuntary withdrawal of a Partner will result in the dissolution of the Partnership.

42. A trustee in bankruptcy or similar third party who may acquire that Dissociated Partner's interest in the Partnership will only acquire that Partner's economic rights and interests and will not acquire

Case ID: 251001108

any other rights of that Partner or be admitted as a Partner of the Partnership or have the right to exercise any management or voting interests.

## ARTICLE XXVII. Dissociation of a Partner.

43. Where the dissociation of a Partner for any reason results in the dissolution of the Partnership, then the Partnership will proceed in a reasonable and timely manner to dissolve the Partnership, with all debts being paid first, prior to any distribution of the remaining funds. Valuation and distribution will be determined as described in the Valuation of Interest section of this Agreement.

44. The remaining Partners retain the right to seek damages from a Dissociated Partner where the dissociation resulted from a malicious or criminal act by the Dissociated Partner or where the Dissociated Partner had breached their fiduciary duty to the Partnership or was in breach of this Agreement or had acted in a way that could reasonably be foreseen to bring harm or damage to the Partnership or the reputation of the Partnership.

## ARTICLE XXVIII. Dissolution.

45. Except as otherwise provided in this Agreement, the Partnership may be dissolved only with the unanimous consent of all Partners.

46. In the event of the dissolution of the Partnership, each Partner will share in any remaining assets or liabilities of the Partnership in proportion to the Partners' ownership interest in the Partnership as described above (the "Dissolution Distribution").

47. Upon dissolution of the Partnership and liquidation of Partnership property, and after payment of all selling costs and expenses, the liquidator will distribute the Partnership assets to the following groups according to the following order of priority:

    a. In satisfaction of liabilities to creditors except Partnership obligations to current Partners;

    b. In satisfaction of Partnership debt obligations to current Partners; and then

    c. To the Partners according to the Dissolution Distribution described above.

48. The claims of each priority group will be satisfied in full before satisfying any claims of a lower priority group. Any excess of Partnership assets after liabilities or any insufficiency in Partnership assets in resolving liabilities under this section will be shared by the Partners according to the Dissolution Distribution described above.

## ARTICLE XXIX. Valuation of Interest.

49. In the absence of a written agreement setting a value, the value of the Partnership will be based on the fair market value appraisal of all Partnership assets (less liabilities) determined in accordance

with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Partners. An appraiser will be appointed within a reasonable period of the date of withdrawal or dissolution. The results of the appraisal will be binding on all Partners. A withdrawing Partner's interest will be based on that Partner's proportion of the Dissolution Distribution described above, less any outstanding liabilities the withdrawing Partner may have to the Partnership. The intent of this section is to ensure the survival of the Partnership despite the withdrawal of any individual Partner.

50. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Partnership books immediately prior to valuation.

## ARTICLE XXX. Goodwill.

51. The goodwill of the Partnership will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## ARTICLE XXXI. Title to Partnership Property.

52. Title to all Partnership property will remain in the name of the Partnership. No Partner or group of Partners will have any ownership interest in such Partnership property in whole or in part.

## ARTICLE XXXII. Force Majeure.

53. A Partner will be free of liability to the Partnership where the Partner is prevented from executing their obligations under this Agreement in whole or in part due to force majeure, such as earthquake, typhoon, flood, fire, and war or any other unforeseen and uncontrollable event where the Partner has communicated the circumstance of said event to any and all other Partners and taken any and all appropriate action to mitigate said event.

## ARTICLE XXXIII. Duty of Loyalty.

54. No Partner will engage in any business, venture, or transaction, whether directly or indirectly, that might be competitive with the business of the Partnership or that would be in direct conflict of interest to the Partnership without the unanimous written consent of the remaining Partners. Any and all business, ventures, or transactions with any appearance of conflict of interest must be fully disclosed to all other Partners. Failure to comply with any of the terms of this clause will be deemed an Involuntary Withdrawal of the offending Partner and may be treated accordingly by the remaining Partners.

## ARTICLE XXXIV. Duty of Accountability for Private Profits.

55. Each Partner must account to the Partnership for any benefit derived by that Partner without the

consent of the other Partners from any transaction concerning the Partnership or any use by that Partner of the Partnership property, name, or business connection. This duty continues to apply to any transactions undertaken after the Partnership has been dissolved but before the affairs of the Partnership have been completely wound up by the surviving Partner or Partners or their Agent or Agents.

## ARTICLE XXXV. Duty to Devote Time.

56. Each Partner will devote such time and attention to the business of the Partnership as the majority of the Partners will from time to time reasonably determine for the conduct of the Partnership business.

## ARTICLE XXXVI. Forbidden Acts.

57. No Partner may do any act in contravention of this Agreement.

58. No Partner may permit, intentionally or unintentionally, the assignment of express, implied, or apparent authority to a third party that is not a Partner in the Partnership.

59. No Partner may do any act that would make it impossible to carry on the ordinary business of the Partnership.

60. No Partner may confess a judgment against the Partnership.

61. No Partner will have the right or authority to bind or obligate the Partnership to any extent with regard to any matter outside of the intended purpose of the Partnership.

62. Any violation of the above Forbidden Acts will be deemed an involuntary withdrawal of the offending Partner and may be treated accordingly by the remaining Partners.

## ARTICLE XXXVII. Indemnification.

63. All Partners will be indemnified and held harmless by the Partnership from and against any and all claims of any nature, whatsoever, arising out of a Partner's participation in Partnership affairs. A Partner will not be entitled to indemnification under this section for liability arising out of gross negligence or willful misconduct of the Partner or the breach by the Partner of any provision of this Agreement.

## ARTICLE XXXVIII. Liability.

64. A Partner will not be liable to the Partnership, or to any other Partner, for any mistake or error in judgment or for any act or omission done in good faith and believed to be within the scope of authority conferred or implied by this Agreement or the Partnership.

**ARTICLE XXXIX. Liability Insurance.**

65. The Partnership may acquire insurance on behalf of any Partner, employee, agent, or other person engaged in the business interest of the Partnership against any liability asserted against them or incurred by them while acting in good faith on behalf of the Partnership.

**ARTICLE XL. Life Insurance.**

66. The Partnership will have the right to acquire life insurance on the lives of any or all of the Partners, whenever it is deemed necessary by the Partnership. Each Partner will cooperate fully with the Partnership in obtaining any such policies of life insurance.

**ARTICLE XLI. Amendments.**

67. This Agreement may not be amended in whole or in part without the unanimous written consent of all Partners.

**ARTICLE XLII. Jurisdiction.**

68. The Partners submit to the jursidiction of the courts of the State of Pennsylvania for the enforcement of this Agreement or any arbitration award or decision arising from this Agreement.

**ARTICLE XLIII. Severability.**

69. If any provision or term of this Agreement is held to be unenforceable, then this Agreement will be deemed amended to the extent necessary to render the otherwise unenforceable provision, and the rest of the Agreement, valid and enforceable. If a court declines to amend this Agreement as provided herein, the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining terms and provisions, which shall be enforced as if the offending term or provision had not been included in this Agreement.

**ARTICLE XLIV. Miscellaneous Provisions.**

70. Time is of the essence in this Agreement.

71. This Agreement may be executed in counterpart.

72. If any term, covenant, condition, or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, it is the Parties' intent that such provision be reduced in scope by the Court only to the extent deemed necessary by that Court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired, or invalidated as a result.

73. This Agreement contains the entire agreement between the Parties. All negotiations and understandings have been included in this Agreement. Statements or representations which may have been made by any Party to this Agreement in the negotiation stages of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value in this Agreement. Only the written terms of this Agreement will bind the Parties.

74. This Agreement and the terms and conditions contained in this Agreement apply to and are binding upon the Partner's successors, assigns, executors, administrators, beneficiaries, and representatives.

75. All of the rights, remedies, and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies, and benefits allowed by law.

76. Any notice to be given under this Agreement shall be in writing and shall be sent by first class mail or air mail to the address of the relevant Party set out at the head of this Agreement. Notices sent as above shall be deemed to have been received 3 working days after the day of posting (in the case of inland first class mail), or 7 working days after the date of posting (in the case of air mail). In proving the giving of a notice it shall be sufficient to prove that the notice was left, or that the envelope containing the notice was properly addressed and posted, as the case may be.

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered in the manner prescribed by law as of the Effective Date first written above.

**Jonathan Monk**

**Signature :**

_____

**Date :**

_____

**Claudia Post**

**Signature :**

_____

**Date :**

_____